GILBERT & SHUGHART PAINTING CONTRACTORS *et al.*, Appellants, v. THE INDUSTRIAL COMMISSION *et al.* (Verne S. Smith, Appellee).

Third District (Industrial Commission Division)   No. 3—84—0783WC

Opinion filed August 30, 1985.

Rex K. Linder and Robert E. Nesemann, both of Heyl, Royster, Voelker & Allen, of Peoria, for appellants.

Allan Hartsock, of Winders & Hartsock, of Rock Island, for appellee.

PRESIDING JUSTICE WEBBER delivered the opinion of the court:

This appeal presents a narrow but difficult question concerning the loss of use of an eye: if as a result of an industrial injury the uncorrected vision is almost totally extinguished but is almost totally restored by the use of artificial lenses, what is the extent of the loss?

Claimant Smith worked as a painter for the respondent Gilbert & Shughart Painting Contractors. While so employed and on the job, Smith was struck in the left eye with a leather tie-down strap. This occurred on July 28, 1978. He was hospitalized and treated for a small laceration on the eyelid and a hemorrhage in the interior chamber of the eye. On discharge from the hospital it was determined that glaucoma had developed in the left eye together with a cataract. A vision test indicated 20/40 in the right eye and 20/400 in the left. This test was administered on August 11, 1978.

In October 1978 a further vision test was administered, and Smith's vision was recorded as 20/20 in the right eye and "finger counting at 10 inches" in the left. In November 1978 he underwent surgical removal of "traumatic cataract and interior vitreous." He was subsequently fitted with a contact lens, and a vision test in December 1979 indicated uncorrected vision in the right eye of 20/25 and corrected vision in the left of 20/30. The final diagnosis of the injury was (1) traumatic hyphema and (2) aphakia secondary to removal of traumatic cataract.

At the December 1979 examination, Smith's physician stated in his testimony that Smith had to wear the contact lens to correct his acuity and balance with the opposite eye. He also stated that no glaucoma was present at that time but that Smith would be prone to develop glaucoma in his left eye in the future.

Also at the arbitration hearing a physician's report on behalf of the respondent was received. It noted that Smith tolerated the contact lens very well. The report stated, *inter alia*, "The surgical result has been excellent, however, the condition of aphakia is quite different from that of having an aphakic eye."

Smith testified that prior to the accident he did not wear glasses and knew of nothing wrong with his eyes. He stated that since the operation his left eye was very sensitive to light and his depth perception was impaired. Without his contact lens, he stated, he could see light and dark and "when you get close up I can make it out, but other than that it is like looking at the bottom of a Coke bottle." He also stated that with the contact lens he attempted to read typewriter sized print, but it was "all blurry" and he could make out only the dark part.

The arbitrator noted that although Smith wore the contact lens comfortably for as long as 14 hours per day, he still had difficulty with depth perception and the reading of small print. He found that prior to the accident Smith had normal vision in his left eye, but since the accident his vision in that eye had been reduced to light perception and finger counting at four feet. Based on those findings, he awarded permanent and complete loss of vision of the left eye to the extent of 100% as provided in section 8(e)13 of the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.8(e)13).

On review the decision of the arbitrator was affirmed by the Commission, and on *certiorari* to the circuit court of McDonough County the Commission's order was confirmed. This appeal followed by the respondent.

Respondent's principal argument on appeal is that it is improper to make a mechanical comparison of uncorrected vision before and after the accident. Rather, it maintains, the comparison should be between the uncorrected vision before the accident and the corrected vision afterwards; so long as some usable vision remains, 100% loss is inappropriate. On this basis it claims that Smith's loss is only 50 to 75%. It further argues that if Smith should suffer a further loss to the left eye, rendering it totally blind with or without correction, he would be unable to claim compensation for that injury even though his ability to work would obviously be damaged as a result of that occurrence.

Claimant Smith counters that the record shows light sensitivity, impairment of depth perception, and inability to read small print. These factors, he maintains, indicate a complete loss and that the Commission's order is not against the manifest weight of the evidence. He also argues that what may happen in the future is not before any of the bodies concerned with the case since it in no way relates to the question of the manifest weight of the evidence.

Both parties cite the same series of supreme court opinions concerned with the question of the measurement of loss of vision. Not surprisingly, they come to opposite conclusions from these authorities. We believe that when closely analyzed the cases support the decision of the Commission.

The case most cited in this area is *Lambert v. Industrial Com.* (1952), 411 Ill. 593, 104 N.E.2d 783. It involved a worker with a congenital condition which rendered him industrially blind without the use of corrective lenses. With corrective lenses, however, the worker had normal vision. The accident destroyed the crystalline lens of the worker's left eye and reduced its corrected vision to 20/50 from 20/20. The accident also reduced the ability of that eye to accommodate. The lens required to correct the vision of the left eye after injury was of such strength that while wearing the lens the worker would be unable, without difficulty, to coordinate the use of both eyes without diplopia or "double vision." On this basis, it was stipulated that the worker's left eye had to be considered "industrially blind" after the accident. (411 Ill. 593, 598, 104 N.E.2d 783, 785-86.) The employer contended, on appeal, that in determining the loss of use of an eye, the naked or uncorrected vision before and after the injury is the relevant consideration. Since the employee was industrially blind both before and after the accident with respect to the naked vision of his left eye, the employer contended that the worker had sustained no compensable loss. In rejecting this argument, the court stated:

> "The real difficulty, and one of the causes of the lack of harmony in the authorities, lies in the fact that neither [the corrected nor uncorrected vision] rule[s] is adequate to cover all cases. If naked vision, alone, is considered, the worker with corrected vision is not adequately protected, and if corrected vision, alone, is considered, the worker with uncorrected vision is not fully protected. In the first instance, the loss of an eye 'industrially blind' with naked vision, but normal with correction, would not be compensable; in the second, an injury rendering a normal eye industrially blind would not be compensable if it could be corrected to normal by the use of glasses.

\* \* \*

The theory behind compensation acts is that industry rather than society should care for its wrecked manpower. That care, whether it be in the form of a specific allowance for specified injuries, or whether it be based on reduced earning power, is to remunerate the injured party for his financial loss through the reduction of his industrial value. Every injury, sustained in the course of the employee's employment, which causes the employee such a loss should be compensable." 411 Ill. 593, 606-07, 104 N.E.2d 783, 789.

*Lambert* was followed in *Walker v. Industrial Com.* (1978), 72 Ill. 2d 408, 381 N.E.2d 238, which quoted the foregoing language, and relying on *Lambert*, the *Walker* court stated that the extent of loss of vision is a question of fact and that the Commission's finding with respect thereto will not be disturbed unless contrary to the manifest weight of the evidence and the reasonable inferences to be drawn therefrom. The court further stated that the degree of loss of vision is not to be determined "by a mechanical measurement as to corrected vision or uncorrected vision." 72 Ill. 2d 408, 413, 381 N.E.2d 238, 240.

The next case of relevance to the one at bar is *Motor Wheel Corp v. Industrial Com.* (1979), 75 Ill. 2d 230, 388 N.E.2d 380. This was a section 19(h) proceeding (Ill. Rev. Stat. 1977, ch. 48, par. 138.19(h)) in an effort by the employer to establish a diminution of disability. The Commission had previously found the claimant to have sustained 100% permanent and complete loss of vision in both eyes. That finding was not appealed, but in apt time the 19(h) petition was filed alleging the diminution of disability through the use of corrective lenses. The court said:

"Motor Wheel argues the denial [of its section 19(h) petition] was contrary to the evidence because the Commission should have considered a change in the claimant's condition, since the award was made, on the basis of improvement by the use of corrective lenses. It urges us to adopt a standard for the determination of loss of vision based on the degree of improvement, after an eye injury, due to correction by lenses, and it cites cases from other jurisdictions in support of that contention. We decline to do so.

Our reasons are firmly and clearly set out in *Lambert v. Industrial Com.* (1952), 411 Ill. 593, 604, 606-07." (*Motor Wheel Corp. v. Industrial Com.* (1979), 75 Ill. 2d 230, 237, 388 N.E.2d 380, 382.)

The court also said in the course of its opinion:

> "*Lambert* stands for the proposition that permanent disability, due to injury of the eyes, is to be determined by actual injury to the victim's eyes as he 'used' them at the time of injury. If he used no corrective lenses, then the difference between uncorrected vision at the time of injury and thereafter is the measure of the damage; if he used corrective lenses, then the difference between corrective vision at the time of injury and thereafter is the measure of damage. *Cf. Walker v. Industrial Com.* (1978), 72 Ill. 2d 408." 75 Ill. 2d 230, 239, 388 N.E.2d 380, 383-84.

The latter statement at first blush appears to be at odds with the holdings in *Lambert* and *Walker*. However, this was clarified in *Oscar Mayer & Co. v. Industrial Com.* (1980), 79 Ill. 2d 254, 402 N.E.2d 607. In that case, the contention was made that under *Motor Wheel* some difference in either corrected or uncorrected vision before or after the accident was necessary to sustain an award for loss of vision. The court stated: "[T]he comment from *Motor Wheel* cited by the respondent was not intended to be a statement of the standard to be used in determining the extent of loss of use of an eye." (79 Ill. 2d 254, 257, 402 N.E.2d 607, 609.) The court then elaborated on the foregoing by saying:

> "In *Lambert v. Industrial Com.* (1952), 411 Ill. 593, it was laid down that in determining the extent of loss of sight or use of an eye one should not measure by the standard of vision as corrected or uncorrected alone. The reason given for this was:
>
> > '[N]either rule is adequate to cover all cases. If naked vision, alone, is considered, the worker with corrected vision is not adequately protected, and if corrected vision, alone, is considered, the worker with uncorrected vision is not fully protected. In the first instance, the loss of an eye "industrially blind" with naked vision, but normal with correction, would not be compensable; in the second, an injury rendering a normal eye industrially blind would not be compensable if it could be corrected to normal by the use of glasses.' 411 Ill. 593, 604.
>
> In *Motor Wheel* we made clear our adherence to the holding in *Lambert*. The comment from *Motor Wheel* on which the respondent relies was not intended as a full statement of standard of the injury or loss. The extent of injury or loss of use is a question of fact to be determined by the Industrial Commission without its being restricted to a standard of uncorrected or cor-

rective vision." 79 Ill. 2d 254, 257, 402 N.E.2d 607, 609.

Another recent case in this area is *Pridgeon v. Industrial Com.* (1982), 89 Ill. 2d 477, 433 N.E.2d 659. In that case the court, citing *Oscar Mayer, Motor Wheel, Walker,* and *Lambert,* said:

"This court has noted previously that our workmen's compensation act contains no standards for determining the percentage of loss of use of an eye, and does not specify whether corrected or uncorrected vision shall be used in determining the extent of eye injuries compensable under the Act. In this State it has been uniformly held that the loss of use of an eye is a question of fact and is not one to be determined by mechanical measurement as to corrected or uncorrected vision." 89 Ill. 2d 477, 479, 433 N.E.2d 659, 660.

■ The sum of all these authorities appears to be that there is no mechanical standard and that the Commission may base an award for loss of vision on either corrected or uncorrected vision or a hybrid of both according to the particular circumstances of the case. There are some isolated statements, particularly in *Motor Wheel,* which look in the direction of a mechanical comparison, but they have been enervated by later statements of the supreme court on the subject, particularly in *Pridgeon* and *Oscar Mayer.* The ultimate judgment of the court in these later cases also supports our conclusion. In *Oscar Mayer* an award was reinstated; a decision favorable to the employer would have required a mechanical application of the corrected-vision standard since the claimant wore glasses prior to the accident. Similarly in *Pridgeon* the Commission found a 75% loss, and this was affirmed by the supreme court although the claimant sought 100% loss on appeal. The 100% loss would have required a mechanical application of the uncorrected-vision test because of the removal of the natural lens.

■ In applying the principle to the instant case, we find that the decision of the Commission, confirmed by the circuit court, was not against the manifest weight of the evidence. There is uncontradicted evidence in the record that Smith suffered some disability even while wearing the contact lens and further evidence that the condition of his eye could further deteriorate through the development of glaucoma. The wearing of the lens itself may properly be regarded as a significant inconvenience, since for practical purposes Smith is sightless in the left eye without it.

We do not agree that the possibility of further injury to the left eye sometime in the future provides any basis for reduction of the award at the present time. There is some evidence, as mentioned

above, of the possible development of glaucoma. If this occurred more than 30 months after the accident, Smith would have no claim under section 19(h) of the Act. The Commission may well have felt that it was better to award 100% now, thus foreclosing any claim based upon some future accident, rather than run the risk that glaucoma or some other complication might not arise until after 30 months. In the latter event, Smith would have only a partial award and no remedy.

The order of the circuit court of McDonough County is affirmed.

Affirmed.

McNAMARA, LINDBERG, BARRY and KASSERMAN, JJ., concur.